UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 05-323-01-RE (Walczac et al) |
| | CR 05-324-01-RE (Gray et al) |
| Plaintiff, | CR 05-325-01-RE (Ail et al) |
| v. | CR 05-326-01-RE (Linn et al) |
| | CR 05-327-01-RE (Laurent et al) |
| | CR 05-328-01-RE (Dyer et al) |
| NICKALAS AIL, et al., | CR 05-329-01-RE (Meadows et al) |
| Defendants. | CR 05-330-01-RE (Ives et al) |
| | CR 05-331-01-RE (Kim Sar et al) |

OPINION AND ORDER

_____

REDDEN, Judge.

The matter is before the court on Motions to Dismiss Indictment for Outrageous Governmental Misconduct filed by defendants Ail (doc. 99), Ives (doc. 68) and Dyer (doc. 122).   Defendants in related cases have joined in the motions and some of them have filed supporting memoranda.   (See Appendix, listing the second-hand stores, and the defendant store owners and employees who have been indicted).

1  –  OPINION AND ORDER

The court has reviewed the parties' memoranda and supporting declarations and considered the evidence and arguments presented during and after the hearing held on July 24, 2007. For the following reasons, the court finds the government did not engage in outrageous conduct in securing the indictments and, therefore, **DENIES** defendants' motions.

## BACKGROUND

These cases arise from the FBI's investigation of "Organized Retail Crime" in the Portland second-hand store market that began in 2001. In August 2005, the investigation culminated in FBI raids on the second-hand stores and indictments of twenty two store owners and/or employees. According to FBI Special Agent Christopher Frazier, at least as early as 1998, dozens of "boosters," commonly drug addicts, were stealing tens of millions of dollars worth of new merchandise annually from retail outlets in Oregon and Southwestern Washington and selling them to the second-hand stores for a fraction of the retail price in order to finance their drug habits. The defendant store owners and employees, in turn, sold the goods to both in- and out-of-state wholesalers and on-line.

Early in the investigation, the FBI identified Lorie Brewster as a person who drove boosters to retail outlets to shoplift merchandise. In exchange for her cooperation as an informant, the FBI granted her transactional immunity and allowed her to keep approximately $130,000 she later received from the boosters as payment for her services as a driver. The FBI also identified David Pankratz as a wholesale purchaser and an on-line reseller of "specialized" stolen merchandise, such as office products,

inkjet cartridges, and computer software and accessories.  The FBI induced Pankratz

to continue his activities and act as an informant.  In exchange, Pankratz also received

transactional immunity and was allowed to keep more than a million dollars worth of the

proceeds from his on-line resale activities.[1]

　　　　Defendants contend the government's conduct allowed Brewster and Pankratz

to engage in and expand the volume and geographic scope of their criminal activities.

They also financially benefitted from the substantial proceeds of their crimes.  This,

defendants say, is the outrageous conduct in violation of their Fifth Amendment due

process rights.  I disagree.

## <u>STANDARDS</u>

　　　　The defense of outrageous government conduct is limited to extreme cases in

which the government's conduct violates fundamental fairness and is shocking to the

universal sense of justice mandated by the Due Process Clause of the Fifth

Amendment.  <u>United States v. Russell</u>, 411 U.S. 423, 431-32 (1973) (quotations

omitted). This standard is met when the government "engineer[s] and direct[s] a

criminal enterprise from start to finish."  <u>United States v. McClelland</u>, 72 F.3d 717, 721-

22 (9th Cir. 1995),  <u>cert</u>. <u>denied</u>, 517 U.S. 1148 (1996).  In determining whether the

government engaged in such outrageous conduct, the evidence is viewed in the light

most favorable to the government.  <u>United States v. Gurolla</u>, 333 F.3d 944, 950 (9th Cir.

2003).  Moreover, "[a]s a matter of general principle, [courts] have recognized that, in

---

[1] The FBI also used another unidentified driver for the boosters and a second
"John Doe" wholesaler of the stolen merchandise as informants.  Defendants' motions,
however, focus on the activities of FBI agent Frazier and the identified informants, Lorie
Brewster and David Pankratz.

order to apprehend those engaged in serious crime, government agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency." United States v. Bogart, 783 F.2d 1428, 1438 (9th Cir. 1986).

The Ninth Circuit has found outrageous conduct in only one case, Greene v. United States, 454 F.2d 783 (9th Cir.1971). There, the government agent contacted the defendant, urged him to run an illegal still and provided materials for the still. They used veiled threats to convince him keep the still running, and the government was the sole customer.

In United States v. So, 755 F.2d 1350, 1353 (9th Cir.1985), the court concluded the government did not engage in outrageous conduct when government agents infiltrated an existing organization, approached persons believed to be already engaged in or planning to participate in the conspiracy, and provided valuable and necessary items to the venture. In Gurolla, id., the government created fake bank accounts in suspect Mexican banks in order to wire money to them. This was not considered to be outrageous conduct. In United States v. Carpenter, 961 F.2d 824, 829 (9th Cir. 1992), the FBI bribed a state senator but this was held not outrageous conduct. In United States v. Fernandez, 388 F.3d 1199, 1239 (9th Cir. 2004), the court rejected a claim of outrageous conduct where the government may have negligently used an informant participating in a potential conspiracy to murder a co-defendant. Most recently, in United States v. Mayer, No. 06-50481, 2007 WL 1760668 *10 (9th Cir. June 20, 2007), the Ninth Circuit again rejected a claim of outrageous conduct where an undercover FBI agent joined the North American Man/Boy Love Association (NAMBLA) to assist in an

4  –   OPINION AND ORDER

investigation of sex tourism involving minors.  The agent created a fake travel agency

web site, corresponded with incarcerated sex offenders, attended a NAMBLA

conference, and facilitated the defendant's purchase of airline tickets for a trip to

Mexico.  This was for a travel group where arrangements were made for the defendant

and others to meet "special friends" based on "age preference."

### DISCUSSION

Defendants rely on three premises to establish governmental outrageous

conduct:  The government  (1)  created defendant's criminal enterprise and operated it

from start to finish, (2)  did not adequately supervise their informants, and (3) rewarded

the informants by allowing them to keep the proceeds from their criminal activities.

### 1.    Vertically Integrated Criminal Enterprise.

Defendants argue the government created a "vertically integrated criminal

enterprise, which it directed and fostered "from start to finish."  See McClelland, infra.

According to defendants, the FBI "took a small group of drug-addicted and unorganized

individuals" and, with the help of informants Brewster and Pankratz, created an

interstate theft ring involving "a new form of criminal theft activity."  This criminal activity

lasted 18 months, during which the government controlled the supply of and demand for

stolen retail goods.  Defendants say the FBI's conduct changed the nature of the earlier

criminal activity by significantly increasing the amount of activity, both monetarily and

geographically.

Defendants point out the FBI began using Brewster and Pankratz as informants

in October 2003 and May 2004 respectively. Thereafter, the purchases of stolen goods

by Cash on the Run III (the primary target store) increased by more than 300%. The defendants contend it was only after Brewster and Pankratz started cooperating with the FBI that the theft ring, using the second hand stores as fences, became organized and flourished as an interstate criminal enterprise.

The government rejects this view, contending the FBI merely "penetrated and investigated existing conspiracies through the use of informants" and had "nothing to do with the creation of a 'criminal enterprise.'" Special Agent Frazier stated in his affidavit and hearing testimony that:

a.  In 2000 or 2001, Frazier learned major retail stores in Oregon and Southwest Washington were incurring annual theft losses totaling tens of millions of dollars, and the FBI began their investigations of area fencing operations.  See Frazier Affidavit in Response to Defendants' Motion to Dismiss Indictments,  ¶A.3.

b.  In February 2002, Frazier began investigating the "Vuong" second-hand store fencing operation and in February 2003, he initiated a second investigation of the "Lee/Tran" fencing operation. Aff., ¶¶A.6-9.  During these investigations, the FBI used Brewster as an informant.  ¶A.14.

c.  In late 2003 and early 2004, Frazier learned that theft losses in Oregon and Washington were increasing.  As a result, he initiated a third  investigation leading to the indictments in this case.  Aff., ¶ A.11.

d.  Regional retail stores requested the FBI to assist in addressing these retail theft problems.  They were told that the FBI intended to use Brewster and Pankratz in the investigation, and they overwhelmingly supported that use.  They acknowledged

that they would suffer further losses, but urged the FBI to proceed..  Gov't. Hearing

Mem., p. 4; Aff. ¶¶ A.4 and B.14(c).

e.  Prior to the third investigation, there were "literally, hundreds of boosters

selling stolen merchandise to the stores."  Aff. ¶ D.19.  Frazier's interviews with boosters

revealed that a significant number of them were active in retail

thefts at least as early as 1998 and 1999.  Gov't. Hearing Mem., Ex. B.

f.  Between 2003 and 2005, the defendants' stores purchased booster-stolen

retail goods averaging approximately 8% of their total volume of all purchases.  Cash on

the Run III, with 18% of their total purchases in 2004, and Kwik Way Cash Store, with

16% in 2005, were the largest volume customers for these stolen goods.  The stores'

sales of stolen goods to Pankratz averaged approximately 34% of the total sales

volume during the same time-frame.  In 2004, Cash on the Run III sold 47% of its total

volume to Pankratz.  In 2005, Buy/Sell/Trade sold 64% of its total sales volume to

Pankratz.  Frazier Aff., Attachment A, Charts 1A-9C.

The evidence established that the government did not create the interstate

criminal enterprise involving the theft and resale of retail goods and did not control the

supply of and demand for the goods.  The criminal enterprise began years before the

FBI's investigation.  The government merely infiltrated the existing enterprise and

created informants out of active criminal participants. The fact that the criminal

enterprise expanded in geographic scope and volume of activity over time did not alter

its fundamental nature.  The amount paid by the defendants' stores for stolen goods

attributable to Brewster-driven boosters averaged only 8% of store volume.  There were

118 boosters identified by the government, but Brewster drove only a handful of them. There were also 27 wholesalers who purchased the stolen goods from the defendants' stores, of whom only two were government informants.  Although Pankratz was one of the more prolific wholesalers, with an average of 34% of the sales during the course of the investigation, he did not create the market.  Moreover, the enterprise was interstate in nature long before the third investigation began.

The retail businesses involved knew the informants retained the proceeds of their criminal activity.  These "victims" supported the government's actions.

I find the government did not create and engineer a "vertically integrated criminal enterprise" from start to finish, as alleged by defendants and, therefore, did not engage in outrageous conduct sufficient to justify dismissal of the indictments.

**2.** **Supervision of Informants.**

In his affidavit, Agent Frazier sets out the government's record regarding the supervision of informant Lorie Brewster and her booster-related activities.

a.  In January 2004, the government approved the use of Lorie Brewster to participate in "Otherwise Illegal Activity" as a driver for boosters Robert Resio, Bryan Thompson, and Nanette Thompson.  Between January 2004 and August 2005, Brewster drove the boosters to retail stores throughout the western United States, including seven of the involved targeted stores.  Because Brewster's role was generally limited to driving,  it was difficult for the government to control the volume of the goods stolen by the boosters.

8   –   OPINION AND ORDER

As noted, despite their substantial financial losses, retailers supported the FBI's efforts. Aff., ¶ B.14 (b) and (c)

b.  With Frazier's knowledge and under his direction, Brewster, also occasionally "cased" stores as a ruse to obtain discarded store receipts to evidence her trips.  On three or four occasions, she told Frazier of skirmishes between the boosters and store security personnel, wherein no injuries were suffered.  On each occasion, Frazier admonished Brewster not to take part in confrontations or risk injury to herself, innocent bystanders, or security personnel.  Aff., ¶ B.14 (d).

c.  Robert Resio, a booster, had a girlfriend ("Jane Doe") who accompanied him on many of his theft runs.  Brewster advised Frazier she suspected the girlfriend was a minor.  During the course of the FBI's  investigation, Resio was arrested by local law enforcement officers for, among other things, contributing to the delinquency of the minor, Jane Doe.  The charge was dismissed, and there was no intervention by the government.  Some second-hand store owners knew of the relationship between Resio and Jane Doe.  While Resio was living at Brewster's house, he and his girlfriend slept in the garage.  Brewster often complained to Resio about Jane Doe's presence and expelled her from the garage on many occasions.  Brewster finally evicted Resio from the home.  Aff., ¶ B.14(e).

I find Brewster's participation in entering some of the targeted stores with agent Frazier's approval was not unreasonable, particularly in the absence of any evidence that her participation increased the risk of harm to bystanders, store customers, employees, or security personnel.

9  –  OPINION AND ORDER

The government did not act in an outrageous manner simply by infiltrating the theft ring and allowing the proceeds from the thefts to support the boosters' drug addictions. The Ninth Circuit stated in <u>Bogart</u>, 783 F.2d at 1438, that the government may have to "lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency" in order to infiltrate a criminal enterprise for the purpose of bringing the criminals to justice. Drug addiction is a major factor in the prevalence of property crimes. The proceeds from the crimes could be expected to be used to feed drug addictions. It is not outrageous conduct for the government to allow crimes to occur when investigating those crimes with the goal of arresting the criminals.

I also find that the government did not facilitate or encourage the illegal and abusive relationship between one of the boosters, Robert Resio, and his seventeen year old girl-friend. To the contrary, while Resio and his girl-friend were staying at Brewster's house, Brewster complained Resio about his relationship and ultimately evicted him and his girl-friend. The defendants cite no legal authority, and this court has found none, for the proposition that the circumstances rose to the level of outrageous <u>government</u> conduct.

### 3.      **Payments to Brewster and Pankratz.**

There is no question that Brewster and Pankratz have been well-rewarded for their cooperation with the government in its investigation. That fact, however, does not warrant dismissal of the indictments for outrageous conduct. <u>See</u> <u>United States v. Cuellar</u>, 96 F.3d 1179 (9th Cir. 1996). There, the defendant was convicted of the possession and distribution of a large amount of cocaine. The conviction was obtained

with the assistance of an informer who was paid approximately $500,000, part of which was contingent on the results of the prosecution.  The Ninth Circuit noted the amount paid to the informer was a "ton of money."   Nevertheless, the court held payment of that amount, even on a contingency fee basis, was not conduct that "is so excessive, flagrant, scandalous, intolerable and offensive as to violate due process."  Id. at 1182.

## CONCLUSION

For these reasons, the Motions to Dismiss Indictment for Outrageous Governmental Misconduct of defendants Ail (doc. 99), Ives (doc. 68) and Dyer (doc. 122) are **DENIED.**

IT IS SO ORDERED.

DATED this 14th day of August, 2007.

/s/ James A. Redden
James A. Redden
Senior United States District Judge

11  –   OPINION AND ORDER

**APPENDIX**

**Second-Hand Stores Cases**

| <u>Case</u> | <u>Store Name</u> | <u>Defendant</u>Owners/Employees |
|---|---|---|
| <u>U.S. v. Walczak</u><br>CR 05-323-RE | Cash on the Run Three | Vernon Walczak and Amanda Walczak/<br>Michael Levy |
| <u>U.S. v. Gray</u><br>CR 05-324-RE | A-1 Cash | Kevin Mason, Sr./Julie Gray |
| <u>U.S. v. Ail</u><br>CR 05-325-RE | Buy/Sell/Trade,<br>fka Cashco | Nickalas Ail/Jamie Holder |
| <u>U.S. v. Linn</u><br>CR 05-326-RE | Kwik Way Cash | John Mark Linn/Shellwyn McMartin,<br>Troy Mohr, and Jennifer Kirkpatrick |
| <u>U.S. v. Laurent</u><br>CR 05-327-RE | Curt's Cash Corner | Curtis Gardner/Kenneth Laurent |
| <u>U.S. v. Dyer,</u><br>CR 05-328-RE | Cash on the Run One | Michael Dyer and Toni Kotek |
| <u>U.S. v. Meadows</u><br>CR 05-329-RE | Cash on the Run Two | Ronald Meadows and Michelle White |
| <u>U.S. v. Ives,</u><br>CR 05-330-RE | River City Trading | Angela-Thompson Ives and Douglas<br>Ives |
| <u>U.S. v. Richman</u><br>CR 05-331-RE | Cash Oasis | Saly Kim Sar and Allen Richman/<br>William Richman |